IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2022

## IN RE DAMIUM F. ET AL.

**Appeal from the Juvenile Court for Davidson County
Nos. PT258228; 2008-2290; 2014-4324; 2015-1437;
2017-4678; 2017-4809; 2019-1340
Sheila Calloway, Judge**

_____

### No. M2021-01301-COA-R3-PT

_____

A mother appeals a trial court's decision to terminate her parental rights to six of her children based on five statutory grounds. She also challenges the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the children. Discerning no error, we affirm the trial court's termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and KENNY W. ARMSTRONG, JJ., joined.

Clayton Michael Cardwell, Nashville, Tennessee, for the appellant, Betty F.

Herbert H. Slatery, III, Attorney General and Reporter, and Courtney Jayne Mohan, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This case involves the termination of Betty F.'s ("Mother") parental rights to six of her children[1]: Damium (born in 2007), Isaiah (born in 2009), Malachi (born in 2015),

_____

[1] Mother has another child, Azariah, who lives with his father and is not part of these proceedings. After the termination petition was filed, Mother gave birth to Mary, who was also removed from Mother's custody; however, Mary is not a part of these proceedings. Lastly, during the termination trial, Mother was pregnant with a ninth child that is not a part of these proceedings.

LaShanda (born in 2015), Catalina (born in 2017), and Serenity (born in 2018).[2] On November 20, 2017, the Tennessee Department of Children's Services ("DCS" or "the Department") filed a petition alleging that the five older children were dependent and neglected due to unstable housing, drug exposure, educational neglect, and domestic violence perpetrated by Mother. Based on that petition, the trial court entered an order that day removing the children from Mother's custody and placing them in DCS custody.

Mother remained essentially homeless in the months following the removal, and she tested positive for cocaine in March 2018. On May 29, 2018, the trial court adjudicated the children dependent and neglected based on Mother's unstable housing and use of illegal drugs. The court then placed the children in the home of their maternal grandparents "on a 90-day Home Trial Visit." After a contested dispositional hearing on September 7, 2018, the trial court concluded that it was in the children's best interest to exit DCS custody and that legal custody be placed with the maternal grandparents. Mother appealed and, after rehearing the matter, the trial court ordered that the children remain with the maternal grandparents because Mother had made very little progress towards changing her circumstances since the removal. Ten days later, however, the maternal grandparents decided they no longer wished to care for the children and left them with DCS. The trial court entered an order removing the children from the maternal grandparents' custody and placing them in DCS custody on April 29, 2019. On December 10, 2019, the children were adjudicated dependent and neglected based on abandonment by the maternal grandparents. The children have been in foster care since April 2019.

While the first dependency and neglect proceedings involving the five older children were pending, Mother gave birth to Serenity, who was born premature and with a life-threatening congenital heart condition that required surgery. At the time of Serenity's birth, Mother remained homeless and was living in a vehicle. As a result, she left the child substantially in the care and physical custody of Erica B., a woman who befriended Mother and offered assistance after learning of Mother's unstable living situation. Mother periodically retrieved the child from Ms. B. to take her to medical appointments, but the child's medical records show that she missed several cardiology appointments and experienced difficulty gaining weight before finally undergoing the necessary heart surgery.

The child's medical records further showed that, on at least two separate occasions, medical personnel called the police due to Mother's "hostile, aggressive, and inappropriate behavior" during the child's medical appointments. For example, in January 2019, the

---

[2] The parental rights of the children's fathers are not at issue on appeal. Damium's father died in 2008. Initially, Isaiah's father was unknown, but by trial, Mother claimed that Lawrence L. was Isaiah's father. The trial court concluded that, under Tenn. Code Ann. § 36-1-117, "Mr. [L.], if he exists at all, is not entitled to notice or service of this petition and/or proceeding nor is termination of any rights that he may have necessary." Aroldo F. is the father of the remaining four children. The trial court terminated his parental rights, and he did not appeal.

police were called to the child's cardiologist's office because Mother was arguing with the child's father, Aroldo F., and cursing so loudly that it interfered with the doctor performing an echocardiogram on the child. When the child was hospitalized on March 18, 2019, hospital personnel summoned police due to Mother's "hostile, aggressive, and inappropriate behavior" with Mr. F. Shortly thereafter, on March 21, 2019, Serenity entered DCS custody pursuant to an emergency protective custody order due to allegations that she was dependent and neglected based on a lack of supervision.

During the pendency of the dependency and neglect proceedings regarding Serenity, Mother's struggle with illegal drug use continued. She acknowledged in April 2019 that she still used illegal drugs, and she consistently refused to submit to drug screens requested by DCS. According to Mother, DCS was "tampering in some manner" with her drug screens. Thus, upon Mother's request, the trial court ordered that she undergo drug screening with Averhealth. The record contains no proof indicating that she ever complied with this order.

The trial court adjudicated Serenity dependent and neglected on August 8, 2019, based on Mother's continued illegal drug use, unstable housing, failure to make any progress in remedying the conditions that led to the other five children's removal, and her volatile relationship with Mr. F. Thereafter, Ms. B. officially became the child's foster mother, and the child has remained continuously in her care since that time.

During the four years following the initial removal in 2017, DCS created several permanency plans.[3] Although DCS notified Mother of the ratification hearings for the permanency plans, she failed to attend most of them. She acknowledged, however, that DCS spoke with her in 2019, 2020, and 2021 about the steps she needed to take to regain custody of her children and stated that she understood what was required of her. Additionally, in 2019, Mother signed the criteria and procedures for termination of parental rights document that explained her parental rights could be terminated if, among other things, she did not substantially comply with the permanency plans' requirements. Mother admitted that she was familiar with the document's contents.

The Department filed a petition to terminate Mother's parental rights on July 16, 2020. After a two-day trial, the trial court entered an order terminating Mother's parental rights. The court determined that the following grounds for termination had been proven by clear and convincing evidence: (1) abandonment by failure to visit, (2) abandonment by failure to support, (3) substantial noncompliance with the requirements of the permanency plans, (4) persistence of conditions, and (5) failure to demonstrate an ability and willingness to assume custody or financial responsibility. The court further determined that there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.

---

[3] The requirements of these permanency plans will be discussed in detail later in this opinion.

Mother appealed and presents the following issues for our review: whether the trial court erred in finding by clear and convincing evidence that grounds existed to terminate her parental rights and whether the court erred in determining that termination of her parental rights was in the best interest of the children.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-

02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)).

ANALYSIS

I. Grounds for termination.

A. Abandonment.

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A) provides five definitions of "abandonment," but only the definition provided in subsection (i) is relevant in this case. At the time the termination petition was filed, subsection (i) defined "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, the trial court determined that Mother abandoned the children by her failure both to visit and to support the children in the four months immediately preceding the filing of the termination petition. The Department filed the petition to terminate Mother's parental rights on July 16, 2020. Thus, the relevant four-month time period for determining whether Mother abandoned the children by failing to visit or to support the children under Tenn. Code Ann. § 36-1-102(1)(A)(i) is March 16, 2020 to July 15, 2020. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the applicable four-month time period for determining whether a parent has willfully failed to support is "the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed"). We will address each abandonment ground in turn.

1. Failure to visit.

A failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). As an affirmative defense, a parent may assert that his or her failure to visit a child was not willful. *Id.* § 36-1-102(1)(I). A parent asserting this affirmative defense bears the burden of proving a lack of willfulness by a preponderance of the evidence, meaning that a parent must prove the absence of willfulness "is more likely true than not true." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(I).

In the context of the parental termination statutes, "willfulness" does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). It merely requires that the conduct at issue consist "of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* We have previously explained "willfulness" as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*Id.* at 863-64 (citations and footnote omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

During the relevant four-month period, Mother had no in-person visits with the children because DCS implemented certain COVID-19 restrictions that limited her to videoconferences with the children. In March and April 2020, Mother requested no videoconference visits and DCS scheduled none. Nyah Cade, the DCS caseworker during the determinative period, explained that the failure to schedule any visits during those two months was due to DCS's inability to contact Mother. Specifically, DCS struggled to establish contact with Mother because her phone number changed several times during the

custodial episode, and she failed to inform DCS when she changed numbers. Typically, DCS would not learn of Mother's newest phone number until she called DCS from that number.

In May 2020, Mother attended a videoconference visit with Damium and Isaiah. The Department scheduled two videoconference visits with all of the children in July 2020, but Mother attended only one of them. Thus, during the determinative period, Mother attended only two visits. Although the trial court did not use the term "token visitation," it is clear from the termination order that the court considered these two visits to constitute token visitation. Specifically, the trial court found that "the mother lacked meaningful visitation and failed to consistently show up and/or participate in visitation . . . ." We agree. This Court has previously concluded that one or two visits during a four-month period is "nothing more than token visitation." *In re Audrey S*, 182 S.W.3d at 867.

The children engaged very little with Mother during the videoconference visits. Ms. Cade described the July visit with all of the children thusly:

> It was very awkward. The older children weren't very engaged. Of course, Mom was saying, "You've gotten big," or, "Your voice is deep," things of that adjectives. And the children w[ere] a little responsive to it, but it wasn't very much conversation. The younger children, hard to be focused. They appeared to not really - - they knew who she was but not really in the engagement. Yeah, *awkward* would be the word to describe it.

Furthermore, Ms. Cade stated that Mother appeared more interested in her youngest child, Mary, who was an infant and had recently entered DCS custody. As a result, these visits were not helpful in developing a meaningful bond with the children. Rather, they constituted "nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[ren]." Tenn. Code Ann. § 36-1-102(1)(C).

Mother contends that her failure to engage in more than token visitation with the children during the relevant time period was not willful. The Department correctly points out that Mother waived a lack of willfulness as a defense to this ground for termination because she failed to assert it as an affirmative defense in her answer to the petition to terminate. *See* TENN. R. CIV. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding a father who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support). However, the defense was tried by implied consent because DCS did not object to testimony regarding willfulness at trial. *See In re Braelyn S.*, No. E2020-00043-CAO-R3-PT, 2020 WL

4200088, at *4 n.3 (Tenn. Ct. App. July 22, 2020) (citing *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) (discussing the standard for trial by implied consent)).

Mother testified that she failed to engage in more than token visitation because DCS significantly restrained or interfered with her ability to visit the children by not allowing in-person visits and by not communicating with her to schedule videoconference visits. As stated above, a parent's failure to visit is "not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child . . . ." *In re Audrey S.*, 182 S.W.3d at 863. "Conduct that would amount to a significant restraint or interference with a parent's ability to visit includes 'blocking access to the child,' 'keeping the child's whereabouts unknown,' and 'vigorously resisting a parent's efforts to visit the child.'" *In re Bonnie E.*, No. E2021-00919-COA-R3-PT, 2022 WL 1572945, at *5 (Tenn. Ct. App. May 19, 2022) (quoting *In re Audrey S.*, 182 S.W.3d at 864 n.34).

Following a thorough review of the record, we conclude that DCS's actions did not constitute a significant restraint or interference with Mother's efforts to visit the children. Although DCS did not permit in-person visits due to the COVID-19 pandemic, DCS attempted to facilitate visits for Mother via videoconference. However, DCS consistently struggled to contact Mother to schedule videoconference visits because Mother frequently changed her phone number and failed to notify DCS of the change. Ms. Cade testified that Mother could have had more visits in May and July 2020 if she had simply maintained contact with DCS. The proof at trial established that Mother contacted DCS only one time requesting a videoconference visit. Specifically, in July 2020, she requested a visit with Damium for his birthday. The Department did not schedule the visit to occur on Damium's birthday, but it did schedule a visit near his birthday. The visit did not occur, however, because Mother claimed to have issues signing in.

Based on the foregoing facts, we determine that, far from presenting an obstacle to Mother, DCS attempted to facilitate visits for Mother. Her failure to visit more than two times during the four-month period is due to her own conduct. In other words, Mother is the author of her own misfortune. We therefore conclude that DCS proved by clear and convincing evidence that Mother's parental rights should be terminated pursuant to this ground.

### 2. Failure to support.

A failure to support occurs when a parent fails, "for a period of four (4) consecutive months, to provide monetary support or [fails] to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" is "support, under the circumstances of the individual case, [that] is insignificant given the parent's

means." *Id.* § 36-1-102(B). A lack of willfulness is also an affirmative defense to this ground for termination. *Id.* § 36-1-102(1)(I).

It is undisputed that Mother made no child support payments during the relevant four-month time period. She claims, however, that she did provide clothes, diapers, and milk for Serenity. Ms. B., Serenity's foster mother, acknowledged that she received those items from Mother but stated that Mother provided them before Serenity entered DCS custody in March 2019, well-outside the relevant time period. The proof introduced at trial shows that Mother provided no form of assistance for Serenity or any of the other children during the four months preceding the filing of the termination petition.

At trial, Mother introduced evidence that her failure to pay support was not willful. Once again, DCS correctly points out that Mother waived a lack of willfulness as a defense to this termination ground because she did not assert it in her answer to the termination petition. However, as with the failure to visit ground, this issue was tried by implied consent because DCS did not object to her testimony regarding willfulness.

Mother testified that she was unemployed during the entire relevant four-month period because she was pregnant with Mary and was unable to work due to complications with the pregnancy. Nonetheless, Mother never claimed during her testimony that she lacked the ability to pay support, and she presented no evidence concerning her living expenses or income (unemployment benefits, disability, etc.). We therefore conclude that Mother failed to establish the affirmative defense of lack of willfulness.

In light of the foregoing, we conclude that this termination ground was proven by clear and convincing evidence.

B. Substantial noncompliance.

The trial court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2), which provides that a parent's rights may be terminated where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a

permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

During the years following the initial 2017 removal, DCS created five permanency plans: December 19, 2017; May 2, 2019; May 31, 2019; May 15, 2020; and April 27, 2021. The plans' requirements remained substantially the same throughout the custodial episode and required Mother to complete the following requirements: (1) complete a parenting assessment and follow any recommendations, (2) complete an alcohol and drug assessment and follow any recommendations, (3) submit to random drug screens, (4) obtain a legal source of income, (5) obtain stable housing, (6) complete a mental health assessment and follow any recommendations, (7) participate in visitations with the children, (8) complete domestic violence counseling, and (9) maintain regular contact with DCS and update her contact information with DCS.

The trial court ratified each of the plans, except for the most recent April 2021 plan, but the court did not make a finding that the plans' requirements were reasonable and related to remedying the conditions that necessitated foster care for the children. Therefore, we review the issue of reasonableness de novo. *See In re Valentine*, 79 S.W.3d at 547. The children entered foster care due to Mother's illegal drug use, homelessness, and her volatile relationship with Mr. F. Because the plans' requirements address these issues, we conclude that the requirements of the plans were reasonable and necessary to remedying the conditions necessitating foster care.

For most of the custodial episode, Mother made little to no effort to address the permanency plans' requirements. When the children returned to DCS custody in 2019, DCS informed Mother that she needed to complete a new alcohol and drug assessment because the one previously completed in 2018 was too old. Mother completed the assessment in October 2020, and it found "that [Mother's] substance use rises to the level of ABUSE and is near the point of dependence." The assessment recommended that Mother complete inpatient treatment for at least thirty days, intensive outpatient treatment, and attend Alcoholics Anonymous and Narcotics Anonymous meetings. Ms. Cade testified that she discussed the assessment and recommendations with Mother and then discussed the treatment options with her. Mother completed none of the recommended treatments. Ms. Cade acknowledged that, in regard to the inpatient treatment recommendation, Mother experienced difficulty finding an inpatient treatment facility because most facilities were not accepting patients due to the COVID-19 pandemic. However, the record contains no evidence that Mother ever sought the other recommended treatments.

Mother admitted that she knew she needed to complete random drug screens. Nevertheless, she consistently failed to comply with requests for drug screens. Ms. Cade testified that Mother's lack of communication with DCS and her refusal to inform DCS of her address made it difficult for DCS to drug screen Mother. When DCS obtained Mother's

latest contact information in 2021, it attempted to drug screen her twice in March; Mother refused to comply with both drug screens. The Department then attempted to drug screen Mother on June 25, 2021, and on July 9, 2021, but Mother again refused to comply. The Department was able to drug screen her on May 7, 2021, and on July 12, 2021. The results for both screens were negative. Because Mother distrusted DCS's drug screens, the trial court ordered Mother to submit to random drug screens through Averhealth. Mother never provided any proof that she complied with Averhealth.

In regard to other required assessments, Mother completed a mental health assessment when she completed the 2018 alcohol and drug assessment. The Department needed an updated mental health assessment when the children returned to DCS custody in 2019, but Mother failed to complete an updated mental health assessment. Indeed, when asked about the mental health assessment at trial, Mother adamantly stated she did not need to complete it because she did not have mental health issues despite the previous assessment recommending treatment because she "appears to have a moderately severe psychological or emotional problem." Mother completed the Free Hearts parenting class on August 24, 2018, but that was not one of the requirements identified on the permanency plans. The plans required that she complete a parenting assessment to determine what specific parenting issues she needed to address; she never completed a parenting assessment.

Beyond failing to complete assessments, Mother failed to maintain a legal source of income. She testified that she occasionally worked at a hair salon that paid her "under the table" and claimed she was briefly employed at UPS and Wendy's. According to Mother, the only time period since April 2019 that she was not employed full-time was between October 2019 and July 2020 when she was pregnant with Mary. However, Mother never provided proof of income to DCS.

Additionally, Mother failed to complete domestic violence counseling. Mother stated that she was unaware of this requirement because it was a recent inclusion, but the proof at trial contradicted her statement. An examination of the parenting plans shows that the domestic violence counseling requirement has appeared on each parenting plan since the initial plan in 2017, and Mother admitted that DCS discussed the parenting plans' requirements with her.

Most importantly, throughout most of the custodial episode, Mother failed to obtain appropriate housing, often living either at a "rooming house", with a cousin, or in a vehicle. She testified that she obtained a two-bedroom home approximately two months before trial, and that she believed all of the children could live with her in that home. Contrary to Mother's belief, Amanda Kelly, the DCS caseworker at the time of trial, testified that she visited the home and determined that it was inappropriate because two bedrooms were not enough for Mother and all of the children, particularly because Mother intended to use one

of the bedrooms for herself. Thus, all six children would have to share the remaining bedroom.

In sum, during the four years between the initial removal and trial, Mother failed to comply with almost all of the plans' requirements. We conclude that DCS proved this termination ground by clear and convincing evidence.

C. Persistence of conditions.

In addition to the grounds above, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>>
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>>
>> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

The persistence of conditions ground "focus[s] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re A.R.*, No. W2008-00558-COA-R3-PT, 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). Therefore, the question we must answer is "the likelihood that the

child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, there is no dispute that all six children were removed from Mother's custody by court order and then adjudicated dependent and neglected more than six months before the termination hearing began. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). The conditions leading to the children's removal included drug use, unstable housing, and domestic violence. In the four years following the initial removal, Mother did very little to demonstrate that the children could ever be safely returned to her custody. For instance, her sobriety remained a concern. She completed no substance abuse treatment despite her alcohol and drug assessment finding that her substance use constituted "ABUSE and is near the point of dependence." Instead, Mother consistently downplayed her substance abuse issues. To her credit, Mother submitted to two drug screens by DCS, and both returned a negative result. But, she refused to comply with requests for drug screens in March, June, and July 2021. Mother also never provided any proof to DCS that she submitted to a single drug screen with Averhealth despite a court order requiring her to do so.

Mother's housing remained a concern. For most of the custodial episode, Mother lived in a "rooming house", with her cousin, or in her vehicle. She repeatedly refused to give her address to DCS, often claiming she was living with someone or searching for housing. Two months before trial, Mother obtained a two-bedroom home. As previously discussed, Ms. Kelly visited the home and determined that it was inappropriate for all of the children.

In regard to domestic violence, we must commend Mother for ending the volatile relationship with Mr. F., but domestic violence still remained an issue. She failed to complete any domestic violence counseling and, at the time of trial, Mother had a pending charge for aggravated assault with a deadly weapon that stemmed from an incident with Mr. F. in 2019.

In addition to the foregoing, Mother refused to accept responsibility for her actions. Rather, she insisted that DCS was to blame for the children not being in her custody. We have previously held that a parent's "refusal to acknowledge any deficiencies in her parenting inspires little confidence that this condition will be remedied in the near future, or that safe reintegration of the Child into [the parent's] home is possible." *In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *8 (Tenn. Ct. App. Sept. 3, 2020).

Lastly, the continuation of the parent and child relationship in this case would also diminish the children's chances of integrating into a permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). The children's foster parents testified that the children are

doing well and are happy in their foster homes. All of the foster parents are interested in adopting the children if they become available for adoption. We conclude that DCS proved the existence of this termination ground by clear and convincing evidence.

### D. Failure to manifest an ability and willingness to personally assume custody.

Finally, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Willingness focuses on the parent's attempts "to overcome the obstacles that prevent [him or her] from assuming custody or financial responsibility for the child." *Id.* Thus, a parent's mere desire to reunite with his or her child is insufficient to demonstrate an ability or a willingness. *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019).

Here, Mother desired to reunite with her children, but her actions failed to demonstrate an ability or a willingness to assume custody of them. At the time the termination petition was filed, four years after the initial removal, Mother had yet to address her mental health, substance abuse, or domestic violence issues. *See In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017) (concluding that a parent must demonstrate ability and willingness as of the date the termination petition was filed). She also lacked a legal source of income and stable housing. We commend Mother for obtaining her current housing, but she did not obtain it until two months before trial—long after the termination petition was filed. And, the size of the home renders it inappropriate due to the large number of children that would need to reside there if she regained custody of them. Moreover, despite this recent positive change, we cannot ignore the near total lack of effort she demonstrated prior to the filing of the termination petition.

Regarding the second prong, the evidence in the record demonstrates that placing the children in Mother's custody "would pose a risk of substantial harm to the physical or

- 14 -

psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). "Substantial harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Given that Mother still lacks adequate housing and that she has yet to address her substance abuse, domestic violence, or mental health issues, we agree with the trial court's finding that placing the children with her poses a risk of substantial harm to their physical and psychological welfare. We conclude that this ground for termination was proven by clear and convincing evidence.

## II. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i).[4] A trial court is not required to find that each of the enumerated factors exists

---

[4] The Tennessee General Assembly amended the statutory best-interest factors in 2021. *See* 2021 TENN. PUB. ACTS ch. 190 § 1 (S.B. 205), eff. April 22, 2021. However, the factors applicable to this appeal are the nine factors identified in Tenn. Code Ann. § 36-1-113(i) (2020), which were in effect when the termination petition was filed on July 16, 2020. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding the version of a termination statute "'that was in force when the petition was filed governs this case'") (quoting *In re Tianna B.*, No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *7 (Tenn. Ct. App. July 6, 2016)) .

before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

After considering all of the best interest factors, the trial court found that the factors favored terminating Mother's parental rights.[5] *See* Tenn. Code Ann. § 36-1-113(i). The evidence in the record before us does not preponderate against the trial court's findings of fact.

The first best interest factor considers whether a parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). As discussed in detail above, Mother struggled to maintain stable housing for most of the four years following the initial removal. Shortly before trial, she obtained a two-bedroom home, but it was inappropriate because it was too small for all of the children to live there with her. She ended her volatile relationship with Mr. F., but she failed to complete any domestic violence counseling. She also failed to complete any substance abuse treatment and or any mental health treatment. Therefore, Mother made no "adjustment of circumstance, conduct, or conditions as to make it safe and in the child[ren]'s best interest" to be in her home. *Id.*

The second best interest factor focuses on a parent's potential for lasting change by examining "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *Id.* § 36-1-113(i)(2). For four years, DCS made reasonable efforts to assist Mother in effecting a lasting adjustment by creating several permanency plans, discussing the requirements of those plans with her, scheduling and funding assessments, scheduling visits with the children when Mother provided her updated contact information, and notifying her of court dates, child and family team meetings, and foster care review boards. Despite DCS's efforts, Mother failed to remedy the conditions that led to the children's removal and made little to no effort to comply with the requirements of the permanency plans. Instead, she refused to take responsibility for her actions and chose to blame DCS for her losing custody of the children. Mother's failure to make an adjustment in her circumstances despite having four years to do so demonstrates "that lasting adjustment does not reasonably appear possible." *Id.*

Next, the trial court found that a meaningful relationship did not exist between Mother and the children because she did not regularly visit them. *See id.* § 36-1-113(i)(3)-

---

[5] The trial court determined that factor six did not apply to Mother. We agree and will not discuss it in the body of this opinion.

(4) ("Whether the parent . . . has maintained regular visitation" and "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child."). Ms. Cade testified that the last in-person visit Mother attended occurred in November 2018. The Department scheduled in-person visits in 2019, but Mother attended none of them. When DCS limited visits to those by videoconference in 2020, Mother attended some of them, but she barely engaged with the six children at issue in this appeal. Rather, she focused on the infant, Mary. Ms. Kelly stated that, when she would set up visits with Mother, the two older children would tell her that they did not want to visit with Mother. Although the younger children did not express a desire not to visit with Mother, they had only a vague memory of her because she had not visited in two years. Thus, the children did not really engage with her during the videoconference visits. We agree with the trial court's finding that Mother did not establish a meaningful relationship with the children due to her failure to regularly visit them.

The trial court also found that changing the children's caretakers and physical environment would have a negative effect on their well-being. *See id.* § 36-1-113(i)(5). The children are happy and doing well in their respective foster homes. They are bonded to the foster parents and refer to them as "mom" and/or "dad". Although the children are in different foster homes, the foster parents have ensured that the siblings maintain a bonded relationship by visiting regularly. The respective foster parents want to adopt the children should they become available for adoption. Mother, on the other hand, failed to make any meaningful change in her circumstances and repeatedly refused to accept responsibility for her actions that led to the children's removal.

Factor seven considers whether there is criminal activity in the home and whether a parent is often unable to care for a child due to substance abuse. *Id.* § 36-1-113(i)(7). At the time of trial, Mother had a pending charge for aggravated assault with a deadly weapon. She also had yet to address her substance abuse issues. She failed to complete any substance abuse treatment, and although she did test negative for illegal substances on two occasions before trial, she refused to submit to several requests for drug screens during the months preceding trial despite knowing that those refusals would be counted as positive drug screens.

Factor eight focuses on a parent's mental or emotional status. *See id.* § 36-1-113(i)(8). The mental health assessment Mother completed in 2018 indicated that she needed treatment for "a moderately severe psychological or emotional problem." Nevertheless, Mother refused to complete an updated mental health assessment when the children returned to DCS custody in 2019, adamantly claiming that she did need mental health treatment because she did not have any mental health issues.

Lastly, factor nine considers whether a parent has paid child support. *Id.* § 36-1-113(i)(9). Despite claiming to be employed for much of the four-year period following the initial removal, Mother never paid child support. Other than providing some diapers and

formula for Serenity shortly after her birth, Mother provided no other assistance to the children.

Based on the foregoing, we conclude that the combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the best interest of the children.

CONCLUSION

We affirm the trial court termination of Mother's parental rights on all five statutory grounds and affirm the trial court's conclusion that termination of Mother's parental rights is in the best interest of the children. Costs of this appeal are assessed against the appellant, Betty F., for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE